[Civ. No. 12932.   First Dist., Div. One.   Jan. 2, 1946.]

BERNARD C. GOODWIN, Appellant, v. BOARD OF TRUS-
TEES OF THE FIREMEN'S RELIEF AND PEN-
SION FUND OF THE CITY OF OAKLAND et al.,
Respondents.

Markell C. Baer and Aiken, Kramer, Aiken & Baer for Appellant.

F. B. Fernhoff, City Attorney, and John W. Collier, Assistant City Attorney for Respondents.

PETERS, P. J.—Plaintiff, Bernard C. Goodwin, instituted this proceeding for a writ of mandate and declaratory relief, contending that under the proper interpretation of certain provisions of the charter of Oakland, upon his voluntary resignation as a fireman, he was entitled to be repaid certain sums which had been deducted from his salary and paid into a relief and pension fund, which sums the city has retained and refused to pay to him. The trial court held that plaintiff was not entitled to the claimed refund and entered its judgment accordingly. From this judgment Goodwin appeals.

The facts are not in dispute and are as follows: Appellant became a member of the Oakland Fire Department on June 5, 1933, at which time he was appointed a hoseman. He voluntarily resigned on May 31, 1943. At the time he entered the city service the charter did not provide for the deduction of any portion of the salary of firemen to be contributed to a pension fund, but it did provide for the allowance by the city of $2.00 per man per month, which sum was paid from the treasury in addition to salaries and deposited in a pension or retirement fund. The city made up the balance. (Deering's Gen. Laws, Act 5557, Stats. of 1919, p. 1364, at p. 1366, § 97, et seq. of the city charter.) Goodwin expressly renounces any claim to a refund of any part of the amount so paid into the fund.

On July 19, 1933, section 97 of the charter was amended to reduce salaries not to exceed 10 per cent and to eliminate the $2.00 monthly allowances theretofore allowed for retirement purposes, and to provide in lieu thereof a monthly deduction from each fireman's salary of five per cent, to be withheld by the city and to be deposited in the pension fund. Section 97 as then amended (Deering's Gen. Laws, Act 5557, Stats. of 1933, p. 3189, p. 3192) read in part as follows (p. 3194): "There shall be deducted from each monthly installment of salary due pursuant to the provisions of this section, a sum equal to five per cent of such monthly installment, which sum so deducted shall be retained by the treasurer of the city and forthwith paid by him into the firemen's relief and pen-

sion fund. The city shall contribute the balance necessary to maintain said fund pursuant to the provisions of this charter.'' Under the retirement system set up by the charter firemen are permitted to retire voluntarily after 20 years of service and upon reaching the age of 55, and, since 1941, are compelled to retire upon reaching the age of 70. In addition, regardless of years of service, they can, and in some cases must, retire if disabled in the course of their duties. In each event they receive one-half of their salaries for life. If the fireman is killed in service his widow or children, or other named relatives, receive a pension.

There was no provision in the 1933 amendments or in any provision of the charter prior thereto for the refund of such deductions or contributions in the event the fireman resigned from service before the happening of the specified contingencies for the payment of retirement, death, or permanent disability allowances.

In 1943, section 97 was amended in several respects not here important and, in addition, the old section was broken up and renumbered sections 97, 97a, 97b, 97c and 97d, with the former paragraphs and provisions substantially carried forward under the new numerical designations. Section 97, as thus changed, continued the old schedule of minimum salaries, with a provision, however, for a 15 per cent increase of salaries under certain conditions, while the above-quoted provision of old section 97 which provided for the five per cent deduction from salaries for the pension fund, was renumbered section 97b. Its language was almost identical with the above-quoted provision from old section 97. As then adopted it reads as follows (Deering's Gen. Laws, Act 5557, Stats. of 1943, p. 3316, at p. 3325): ''Sec. 97b. There shall be deducted from each monthly installment of salary due pursuant to the provisions of Section 97, a sum equal to five per cent of such monthly installment, which sum so deducted shall be retained by the Treasurer of the City and forthwith paid by him into the Firemen's Relief and Pension Fund. The City shall contribute the balance necessary to maintain said fund pursuant to the provisions of this Charter. . . .''

The same session of the Legislature approved another amendment to the Oakland charter, both it and the amendments to section 97 becoming effective May 4, 1943. This other amendment consisted of adding to the charter a new section, numbered section 101½. It reads as follows (Deer-

ing's Gen. Laws, Act 5557, Stats. of 1943, p. 3316, at p. 3327):
"Sec. 101½. Any member of the Department who resigns
or is discharged from the service previous to retirement, shall
have all such sums as have been deducted from his pay and
contributed to the Firemen's Relief and Pension Fund pur-
suant to the provisions of Section 97b, refunded to him plus
simple interest at the rate fixed by the Board of Trustees."
Twenty-seven days after this amendment became effective
appellant voluntarily resigned.

The respondents' position, and the basis of the judgment in
their favor, is that appellant upon his resignation was entitled
to receive back only such salary deductions as were taken out
of his salary subsequent to the adoption of this section on
May 4, 1943.

Appellant's position is that upon his resignation he was
entitled to a refund of all deductions made from his salary
and retained by the city since the amendment to section 97
in 1933. In support of this position he urges that the charter
sections expressly grant the petitioner a refund of all salary
deductions; that under section 101½ it is not the salary de-
ductions under "Section 97b" as such that shall be refunded,
but the salary deductions under "the provisions" of the sec-
tion, and these "provisions" are the identical "provisions"
which continuously existed in the charter since 1933. It is
argued that the only change in the language of section 97b
from the language of the former section 97 was that it re-
ferred to deductions from the salaries paid under the pro-
visions of section 97b, instead of the deductions made under
the provisions of "this section," and that the legislative in-
tent of the framers of the charter was clearly to keep the old
provisions continuous, which they attempted to do by splitting
the section into several sections numbered 97, 97a, 97b, 97c
and 97d, and carrying through into the renumbered sections
practically the identical provisions of the former section, which
had become quite lengthy and cumbersome. In such a case, it
is argued, the numerical designations of the charter are to
be disregarded and such a change constitutes but a continua-
tion of the old statute, there being no break in the continuous
operation of the old statute. (*Sobey* v. *Molony*, 40 Cal.App.2d
381 [104 P.2d 868].) Thus, appellant argues, section 101½
is to be construed and understood as if it referred to the old
section 97 as well as to "the provisions of Section 97b."

Appellant also argues that the charter amendment so con-

strued expresses a reasonable purpose; that the money deducted from the salary for retirement purposes was in a proper sense withheld by the city in trust for retirement purposes, and that when the trust fails, as it does upon the resignation of the employee, the employee is entitled to the refund of his contributions. Appellant points out that under numerous other retirement systems express provision is made for the refund of moneys contributed to the retirement fund or withheld from the salaries when the employee voluntarily resigns before reaching retirement age. Appellant adds in this regard that, as is true of all pension provisions and statutes of such type, the provisions must be liberally construed to effect the spirit and purpose of the act, and he urges that that purpose can only be served here by granting to petitioner the full refund of all of his salary contributions since the time they were first taken from him in 1933 and to the date of his resignation.

He contends that the construction contended for is not unconstitutional. He urges that the giving of the amendment a retroactive application does not involve a gift of public funds, because public funds are not here involved, but moneys belonging to the petitioner; further, that it has been held that giving a pension statute a retroactive effect does not involve a gift of public moneys where the employee served in contemplation of the ultimate granting of a pension (*Murphy* v. *City of Piedmont,* 17 Cal.App.2d 569 [62 P.2d 614, 64 P.2d 399]) ; also it has been held that where a retroactive construction was given to a pension statute which granted the employee benefits based in part upon services rendered prior to the enactment of the statute, no gift of public moneys was involved, but it was in the nature of additional salary to be paid for services rendered after the enactment of the provision in question. (*Whitehead* v. *Davie,* 189 Cal. 715 [209 P. 1008].)

Based on these cases, he argues that his right to a refund is predicated upon contract; that after 1933, when the city began to deduct and hold back portions of his salary, he had a right to contemplate that upon his resignation he would be entitled to receive the balance of his salary payments under general principles of law and equity, but that when the charter was amended to expressly state such an obligation upon the city's part, he had a right to rely upon the contractual rights thus established, and to take advantage of its provisions and to resign under its scope and effect.

Nor does section 101½, if construed in accordance with

appellant's contention, he argues, create an indebtedness on the part of the city for past years when no liability existed, because before its enactment the city was under an equitable obligation to refund the contributions in such a case, and appellant having resigned after the enactment of the statute, and in reliance thereon, the city was then liable under its contract to refund the money.

The correct answer to all of these contentions depends upon the rights of appellant between 1933 and May 4, 1943. During that period there was deducted certain sums from each fireman's salary, which sums were paid into the fund. The city made up the balance. There was no provision for a refund of the deducted amounts upon resignation before reaching retirement age. It seems to be appellant's position that nevertheless there was an implied obligation on the part of the city to return these moneys if the employee resigned. This thought seems to be predicated on the concept that during those ten years the employee received nothing for these deductions, and that they were simply retained by the city as trust funds to be ultimately repaid as part of the retirement allowance if the employee ever retired. This is not a correct analysis of the legal rights of the parties. This retirement system, unlike some such systems, was not based on the theory that contributions paid by each employee were to be paid into a separate individual fund or account for him, and upon reaching retirement age, matched by the governmental body involved, and that fund then used to pay that retirement allowance. Here the contributions of the firemen were paid into a fund designated as the Firemen's Relief and Pension Fund. The city expressly assumed the liability to keep such fund solvent. Such a plan does not limit the retirement allowance to the fund, but the obligation to pay the retirement allowance, once it vests, becomes a general obligation of the governmental agency involved. (*England* v. *City of Long Beach,* 27 Cal.2d 343 [163 P.2d 865].) Nor is it correct to say that during the period 1933-1943 the firemen received nothing for their deductions unless they retired. The plan set up by the charter did not only provide for retirement based upon age and years of service. In addition it provided for retirement, regardless of age and years of service, for a fireman disabled in the course of his employment. It also called for pensions for the families of firemen if the firemen were killed in the service. To this extent the plan called for a limited type

of protection in the nature of accident insurance. The deductions made each month were paid, therefore, not only towards an ultimate annuity to be paid upon reaching the age of retirement, but also for this accident insurance. As long as there was no provision in the charter for a refund of these funds in the event of voluntary resignation before reaching retirement age, it must be held that under the type of plan here involved the deductions were in the nature of premiums for the types of protection above outlined. This being so there was no legal or equitable, express or implied, obligation until May 4, 1943, on the part of the city to refund these sums if the employee voluntarily resigned. No other conclusion is permissible. The moneys paid into the fund were not trust funds belonging to the firemen, but public moneys of the city. It should be here noted that the five per cent deduction made from a fireman's salary was obviously insufficient alone to support the pension plan. Under the plan a fireman could retire at 55 after 20 years of service. During that period he would pay into the fund the equivalent of one year's salary. This would pay him half salary for but two years. Obviously, at 55, his life expectancy is much longer. Thus it is clear that, as accident insurance plus the possibility of a future annuity, firemen received a *quid pro quo* for their deductions.

Once it is determined that no obligation existed between 1933 and May 4, 1943, to make a refund in the case of voluntary resignation before reaching retirement age, the problem involved becomes relatively simple. As a matter of interpretation, sections 97, 97a, 97b, 97c, 97d and 101½ as amended or added in 1943, by their very terms, are prospective in their operation. Section 97, as amended in 1943, provided for a 15 per cent raise in salary. The section numbered section 97b in 1943 provided for a five per cent deduction from the salaries as fixed by the amended section 97, not as they were fixed in the old section 97. Section 101½, added in 1943, provided for a refund, in case of resignation or discharge from service prior to retirement, of all sums contributed by the firemen "pursuant to the provisions of Section 97b." Obviously, since section 97b did not exist until May 4, 1943, the only sums paid pursuant thereto were those paid after that date. Both amended section 97 and its subdivisions, and new section 101½ by their very terms are prospective and not retroactive in their operation.

The conclusion that section 101½ was intended to act

only prospectively is strengthened if not compelled by the fact that if held to be retroactive it would be unconstitutional. If no obligation existed between 1933-1943 to make such refunds, and it has already been so held, it is too clear to require further comment that for the city to assume an obligation to pay for services after they are rendered when no obligation existed at the time of rendition, would be to violate the provision of the Constitution prohibiting gifts of public funds.

The judgment appealed from is affirmed.

Knight, J., and Ward, J., concurred.